IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:15-CV-104-FL

| | | |
|---|---|---|
| SCOTT A. MERY, Plaintiff/Claimant, v. CAROLYN W. COLVIN, Acting Commissioner of Social Security, Defendant. | ) | **MEMORANDUM AND RECOMMENDATION** |

This matter is before the court on the parties' cross-motions for judgment on the pleadings [DE-17, DE-19] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Claimant Scott A. Mery ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the denial of his application for a period of disability and Disability Insurance Benefits ("DIB"). The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be denied, Defendant's Motion for Judgment on the Pleadings be allowed, and the final decision of the Commissioner be upheld.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on February 8, 2012, alleging disability beginning January 1, 2012. (R. 22, 193-94). His claim was denied initially and upon reconsideration. (R. 22, 90-117). A hearing before the Administrative Law Judge ("ALJ") was held on October 22, 2013, at which Claimant, represented by counsel, and a vocational expert

("VE") appeared and testified. (R. 41-89). On January 27, 2014, the ALJ issued a decision denying Claimant's request for benefits. (R. 19-40). Claimant then requested a review of the ALJ's decision by the Appeals Council (R. 16-18), and submitted additional evidence as part of his request (R. 7-11). The Appeals Council determined the new evidence was relevant to a period after the ALJ's decision and denied Claimant's request for review on April 16, 2015. (R. 1-6). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence

and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

In this case, Claimant alleges that the ALJ erred by (1) concluding Claimant did not meet Listings 1.02, 1.04, and 11.09, (2) concluding Claimant has the residual functional capacity ("RFC")

to perform a reduced range of medium exertion work and his past relevant work, and (3) improperly weighing the opinions of Claimant's treating physicians. Pl.'s Mem. [DE-18] at 11-22.

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in substantial gainful activity since the alleged onset date. (R. 24-25). Next, the ALJ determined Claimant had the following severe impairments: relapsing remitting multiple sclerosis ("RRMS" or "MS") and cervicalgia status-post ACDF at C3-6. (R. 25-26). The ALJ also found Claimant to have the non-severe impairments of left hip post-arthroscopy, chronic low back pain, intermittent lower extremity radicular symptoms, lightheadedness and dizziness, and mild bilateral optic neuropathy. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 26).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform medium work[1] with the following limitations: never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; frequently balance, stoop, crouch, kneel, and crawl; and frequently reach overhead with both arms. (R. 27-34). In making this assessment, the ALJ found Claimant's statements about his limitations not fully credible. (R. 27-31). At step four, the ALJ concluded Claimant could perform his past relevant work as a sales representative–dairy

[1] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If someone can do medium work, he can also do sedentary and light work. 20 C.F.R. § 404.1567(c).

supplies; sales representative–food supplies; general merchandise sales representative; stock control clerk; and merchandise displayer. (R. 34). Alternatively, at step five, upon considering Claimant's age, education, work experience, and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 34-35).

**B. Claimant's Testimony at the Administrative Hearing**

Claimant has a high school education, was 52 years old, and lived with his wife at the time of the administrative hearing. (R. 44-45). He last worked from May to August 2013, part-time from 8 to 15 hours a week, as a merchandiser stocking shelves for Kellogg. (R. 45-47). The job required him to lift from 20 to 50 pounds. (R. 47-48). Claimant was not terminated and left the job by choice. (R. 48). He was offered a merchandising position with Premium Retail Services on April 12, 2013, but declined the position because it required employees to be paid by debit card, which incurred a fee. (R. 48-49). Claimant also worked in merchandising at Advantage Sales Marketing beginning on February 22, 2013. (R. 49-50). That job required him to lift heavy products weighing from 25 to 30 pounds and to move pallets weighing 1,000 pounds onto the sales floor to build displays. (R. 50-52). Claimant was supposed to use a mechanical handheld jack to move the pallets, but sometimes used an electric jack, although he would get in trouble for doing so. (R. 50-51). He did not inform his employers about his MS, because it is "not really hampering [him] to the point where [he is] in a wheelchair," but he has other problems, including with his neck, back, and hip, and moving the pallets became too strenuous so he chose to leave Advantage after less than three months. (R. 50, 52).

Claimant previously worked as a merchandiser at Crossmark, but his job duties mostly

required doing surveys to ensure product was on the sales floor, as opposed to moving and stocking product. (R. 52-53). He was out of work from that job due to neck surgery in August 2012, and when he returned to work his territory had been reassigned and he was given a new territory that was farther out where he did not have contacts. (R. 53-54). Claimant exchanged words with his manager and they mutually agreed to part ways. (R. 54-55). Claimant also worked part-time for four years as a merchandiser at Radlo Foods, an egg broker, where his duties entailed surveying the eggs in the retail store and talking with the dairy manager. (R. 55-56). His time at Crossmark and Radlo overlapped. (R. 57). After Radlo lost several accounts, his position was eliminated. (R. 56-57). Claimant did other sales work for a bottled water company, an ice cream company, and Tuff Shed and Edge Sales, which involved little physical work and mostly driving and checking on product. (R. 57-62).

Claimant has not worked more than 10 to 15 hours a week since January 2012 when his neurologist recommended that due to his MS he could not work more than 10 to 12 hours weekly. (R. 67-68). He was diagnosed with MS more than 30 years ago, but since 2012 has experienced increased lethargy and leg spasms. (R. 68-69). Certain things may exacerbate his MS, such as a hip surgery six months prior to the hearing that caused numbness from the waist down and for which his neurologist had prescribed a steroid a week earlier. (R. 69). Claimant at times experiences pain in conjunction with the numbness. (R. 70). For about a year prior to the hearing, Claimant experienced light-headedness and dizzy spells constantly, and he had an appointment the following week scheduled with his neurologist to address this concern. *Id.* Claimant's MS caused his vision to deteriorate, and he required corrective lenses for the past two years. (R. 70). Claimant's MS can affect his ability to drive at times, but he would not let it bother him and drove because he had to.

(R. 71). Now he has no issues with driving because he takes it easier than he did before. *Id.* Claimant does not know when he might have a flare-up, and he takes prednisone, which can take up to two weeks to resolve his symptoms. (R. 71-72).

In August 2012, Claimant underwent a neck fusion. (R. 72). Prior to his surgery, Claimant experienced neck, shoulder, and arm pain, but at the administrative hearing he described the pain as very minimal, indicating the surgery "helped a whole lot" and that he recovered in about eight months. *Id.* Claimant also experiences constant back pain throughout the day, which can be sharp, dull, or numbing. (R. 73). He had experienced back pain for 15 years and had learned to live with it until the work he had been trying to do started to get to him. *Id.* Claimant receives no treatment for his back and was told he was not a candidate for surgery. (R. 79). He was given epidurals in the past, which worked for three to four months, but after two years they stopped working. (R. 80). He does not like to take pain medication, because he does not want to add to any dizziness he experiences, but does take Tylenol. (R. 80-81). Claimant had left-hip surgery, which went well, and was still using a cane at the hearing. (R. 73). His doctor indicated he may need a hip replacement in the future. *Id.* He also experiences pain in his right hip and was going to have it evaluated. (R. 74).

Claimant can stand, sit, or walk for about 30 minutes at a time, and prior to his hip surgery could not bend, stoop, or squat without pain. (R. 75-76). He experiences some discomfort reaching and extending his arms. (R. 79). Claimant pushes harder than his doctors want him to, but does not think he could work a 40-hour-a-week job due to the totality of his impairments. (R. 77-78).

### C. Vocational Expert's Testimony at the Administrative Hearing

Melissa Stuart testified as a VE at the administrative hearing. (R. 82-87). After the VE's

testimony regarding Claimant's past work experience (R. 82-83), the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant who can perform medium-exertion work with the limitations of never climb ladders, ropes, or scaffolds, occasionally climb ramps or stairs, frequently balance, stoop, crouch, kneel, and crawl, and frequently reach overhead with both arms. (R. 84). The VE responded that such an individual could perform Claimant's past relevant work, as well as the following jobs: counter supply clerk, Dictionary of Occupational Titles ("DOT") # 319.687-010, medium exertion, and SVP level 2; hospital cleaner, DOT # 323.687-010, medium exertion, and SVP level 3; and rural mail carrier, DOT # 230.363-010, medium exertion, and SVP level 2. (R. 84-85). The ALJ posed a second hypothetical with an individual that can perform light-exertion work, with the same limitations of the first hypothetical, and, additionally, would be absent from work four or more days per month. (R. 85). The VE opined that such an individual would be precluded from all work. *Id.* The VE stated that her testimony was consistent with the DOT. *Id.*

In response to questioning from Claimant's counsel, the VE agreed that an individual limited to working 10 to 12 hours weekly would not make at least $1,000 monthly, or SGA, in the field of Claimant's past relevant work. (R. 86). Claimant's counsel asked the VE whether an individual limited to lifting and carrying no more than 20 pounds occasionally, ten pounds frequently, standing no more than six hours out of an eight hour day, sitting no more than six hours out of an eight hour day, limited pushing or pulling in the upper and lower extremities, no climbing ramps, stairs, ladders, ropes, or scaffolds, no unprotected heights, and no more than occasional balancing, kneeling, crawling, and stooping could perform Claimant's past relevant work, and the VE responded in the negative. (R. 86-87). The ALJ took judicial notice that a limitation to sedentary-exertion work

would eliminate Claimant's past relevant work. (R. 87).

## V. DISCUSSION

### A. The ALJ's Consideration of Listings 1.02 (Major Dysfunction of a Joint), 1.04 (Disorders of the Spine), and 11.09 (Multiple Sclerosis)

Claimant first contends the ALJ erred in finding that Claimant's physical impairments do not meet or equal Listings 1.02, 1.04, and 11.09. Pl.'s Mem. [DE-18] at 11-15. The Commissioner contends that the ALJ correctly determined that Claimant's impairments do not meet or equal a listing. Def.'s Mem. [DE-20] at 23-25.

To show disability under the listings, a claimant may present evidence either that the impairment meets or is "medically equivalent" to a listed impairment. *See Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir. 1986); 20 C.F.R. § 404.1526 (regulations for determining medical equivalence). Disability is conclusively established if a claimant's impairments meet all the criteria of a listing or are medically equivalent to a listing. 20 C.F.R. § 404.1520(d). "The [ALJ] . . . is responsible for deciding . . . whether a listing is met or equaled." S.S.R. 96-6p, 1996 WL 374180, at *3 (July 2, 1996). In order to determine whether a medical impairment equals a listing, the ALJ is bound to "consider all evidence in [claimant's] case record about [the] impairment(s) and its effects on [claimant] that is relevant to this finding. . . . [The ALJ] also consider[s] the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. § 404.1526(c). "For a claimant to qualify for benefits by showing that his . . . combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the

overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531. "Plaintiffs bear the burden of proving their condition meets a listing and, accordingly, the responsibility of producing evidence to sustain their claims." *Rowe v. Astrue*, No. 5:07-CV-478-BO, 2008 WL 4772199, at *1 (E.D.N.C. Oct. 28, 2008) (unpublished) (citing *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995)). Thus, where a claimant "fails to articulate why h[is] medical impairments do, in fact, meet all of the elements of a given listed impairment," he fails to meet his burden. *Id.* (citing *Sullivan*, 493 U.S. at 530).

**1. Listings 1.02 and 1.04**

Listing 1.02, entitled "major dysfunction of a joint(s)," consists of two major subparts, Listings 1.02A and 1.02B. If either is satisfied, the claimant is regarded as disabled. Both are characterized by "gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02. Plaintiff's argument cites the criteria for Listing 1.02A, Pl.'s Mem. [DE-18] at 12, which additionally requires "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b."[2] 20 C.F.R.

[2] Claimant does not appear to argue that his impairments meet or equal Listing 1.02B, which requires "[i]nvolvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02B. The "inability to perform fine and gross movements effectively," as used in Listing 1.02B, requires an "extreme loss of function in both upper extremities" such that the individual is not "capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living." *Id.* § 1.00B.2(c). For example, where the individual is unable to perform the activities of preparing a simple meal, managing personal hygiene, sorting and handling papers, or placing files in a cabinet above waist level, the individual is unable to perform fine and gross movements effectively. *Id.* While Claimant testified he experiences some discomfort reaching and extending his arms (R. 79), there is no evidence in the record establishing "an inability to perform fine and gross movements effectively," as defined in the listings.

pt. 404, subpt. P, app. 1, § 1.02A. "Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities," and examples of ineffective ambulation are "the inability to walk without the use of a walker, [or] two crutches or two canes." *Id.* § 1.00B.2.b(1), (2); *McAuley v. Colvin*, No. 7:12-CV-311-D, 2013 WL 7098724, at *9 (E.D.N.C. Dec. 13, 2013) (unpublished) ("[A]n inability to ambulate effectively means an inability to ambulate without the use of a device that requires *both* upper extremities" and the "use of a cane does not bring [the claimant] within the ambit of 1.04(C).") (emphasis in the original) (citing 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B.2.b(2)). However, other examples of ineffective ambulation include "the inability to walk a block at a reasonable pace on rough or uneven surfaces" and "the inability to climb a few steps at a reasonable pace with the use of a single hand rail." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B.2.b(2); *Fleming v. Barnhart*, 284 F. Supp. 2d 256, 268 (D. Md. 2003) (noting "if [a claimant] who uses [only] one cane or one crutch is otherwise unable to effectively ambulate, the impairment(s) might still meet or equal a listing") (quoting Revised Medical Criteria for Determination of Disability, Musculoskeletal System and Related Criteria, 66 Fed. Reg. 58,010, 58, 013 (Nov. 19, 2001) ("[W]e do not consider required use of one cane or crutch to automatically exclude all gainful activity. However, if someone who uses one cane or crutch is otherwise unable to effectively ambulate, the impairment(s) might still meet or equal a listing.")).

The ALJ first noted that no medical expert had opined, and Claimant's representative had not argued, that Claimant's impairments met or equaled a listing. (R. 26). Although the ALJ discussed Listing 1.04, she did not discuss Listing 1.02. *Id.* However, the failure to do so was harmless where Claimant has failed to demonstrate his impairments met or equaled the listing. *See*

*Locklear v. Colvin*, No. 7:14-CV-154-FL, 2015 WL 4740786, at *4 (E.D.N.C. Aug. 10, 2015) (unpublished) (finding any error in failing to discuss certain listings was harmless because the claimant failed to show she met or equaled the criteria under any of the listings). Claimant cites findings related to his back, neck, and hip in arguing that his impairments meet or equal Listing 1.02A. Pl.'s Mem. [DE-18] at 12-14. However, neither the medical records nor Claimant's testimony demonstrate an inability to ambulate effectively.

While it was noted at the hearing that Claimant was utilizing a cane three weeks after his hip surgery (R. 73-74), the ALJ found that Claimant's hip "healed quickly and without any lasting functional limitations" and that Claimant was 100% weight bearing with a normal gait, taking no medication, and reported feeling great five weeks after surgery. (R. 25, 466-67). Additionally, Claimant testified at the hearing that he could walk about 30 minutes before needing to stop and rest. (R. 76). During a May 29, 2012 Disability Determination Services ("DDS") consultative examination, Dr. Zota noted Claimant did not use an assistive device and concluded that, based on Claimant's impairments, he could walk about a half a mile. (R. 349). On April 3, 2013, Claimant's treating orthopedist, Dr. Lestini, completed a medical source statement indicating Claimant could stand and/or walk about six hours in an eight-hour day and did not require a hand-held assistive device for ambulation. (R. 434). Finally, although Claimant reported right hip pain and was noted to have difficulty ambulating on November 25, 2013 (R. 579), at a December 6, 2013 follow-up appointment following a right-hip MRI, it was noted Claimant was being treated with ibuprofen and physical therapy, his condition had improved, and arthroscopy, which was effective for the left hip, was recommended (R. 576-77). Accordingly, Claimant has failed to demonstrate that his impairments meet or equal Listing 1.02A, where there is no evidence in the record to support that

Claimant demonstrated an inability to ambulate effectively for the requisite durational period. *See Drotar v. Colvin*, No. 7:13-CV-265-FL, 2015 WL 965626, at *3 (E.D.N.C. Mar. 4, 2015) (unpublished) ("An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify," and to establish equivalence "a claimant must present medical findings equal in severity and duration to all the criteria for a listing") (citations omitted).

Listing 1.04 refers generally to disorders of the spine. 20 C.F.R. pt. 404, subpt., P, app. 1, § 1.04. To satisfy Listing 1.04, a claimant must show a disorder of the spine "(e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord" with one of the following:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> OR
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> OR
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Id.*; *see Drotar*, 2015 WL 965626, at *5 (discussing the criteria to meet or equal Listing 1.04).

The ALJ addressed Listing 1.04, concluding Claimant's spinal condition did not meet or

medically equal the listing requirements because "[t]he evidence of record does not reveal that the claimant has undergone radiographic imaging studies demonstrating evidence that a nerve root or the spinal cord was compromised," "[n]or does the evidence of record show that the claimant has neurological deficits, spinal arachnoiditis, or lumbar spinal stenosis." (R. 26). Claimant cites several MRI findings, including cervical stenosis, cervicalgia, thoracic region disc disorder, and MS (R. 462-64), multilevel degenerative spondylosis and a disc bulge/herniation (R. 486-87), and mild central canal narrowing and indentation of the ventral right portion of the spinal cord, foraminal narrowing, and facet arthropathy at various levels (R. 344-46). Despite these findings, Claimant has failed to demonstrate his impairments meet all the requirements of Listing 1.04. With respect to Listing 1.04A, Claimant has cited no evidence of nerve root compression, and, therefore, his impairments do not meet the listing. Likewise, there is no evidence of spinal arachnoiditis, and, therefore, his impairments do not meet Listing 1.04B. And, as explained above, Claimant has failed to demonstrate an "inability to ambulate effectively," and, therefore, his impairments do not meet Listing 1.04C. "An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify." *Drotar*, 2015 WL 965626, at *5 (citing *Sullivan*, 493 U.S. at 530).

To the extent Claimant argues equivalence, the ALJ's thorough discussion of the medical evidence related to Claimant's back, neck, and hip impairments demonstrates that these impairments do not equal Listing 1.04. (R. 28-31). The ALJ found that, after Claimant's August 2012 neck fusion, his symptoms were mostly resolved with the exception of some mild pain and mild limited range of motion, consistent with the fusion, and that in November and December 2013, Claimant reported no neck problems. (R. 28-30). "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir.1986) (per curiam).

Similarly, as discussed above, Claimant's left-hip impairment was resolved with surgery (R. 25, 466-67) and his right-hip impairment does not meet the durational requirement (R. 576-79). *See Drotar*, 2015 WL 965626, at *5 (to establish equivalence "a claimant must present medical findings equal in severity and duration to all the criteria for a listing"). Finally, the ALJ determined Claimant's chronic low back pain and intermittent lower extremity radicular symptoms had "no more than a minimal impact" on Claimant's functioning. (R. 25). The ALJ specifically noted that a March 2013 MRI of the lumbar spine showed degenerative disc disease at L4-5 (R. 468, 486), but that physical examination of the lumbar spine in August, September, and October 2013 showed no pain, swelling, edema, muscle spasm, or tenderness to palpation (R. 467, 472, 477), and that Claimant's treating orthopedist had examined Claimant as recently as September 19, 2013 and indicated that Claimant's lumbar stenosis at L4-5 and L5-S1 was "not bothering him very much" (R. 470). While Claimant cites several MRI findings, as noted above, diagnoses without a corresponding functional limitation of listing-level severity are insufficient to demonstrate equivalence. *See Gross*, 785 F.2d at 1166 (holding that the diagnosis of a condition, alone, is insufficient to prove disability, because there must also be "a showing of related functional loss"). Accordingly, the ALJ did not err in determining Claimant's impairments do not meet or equal Listing 1.04.

**2. Listing 11.09**

To meet Listing 11.09 requires a diagnosis of MS with one of the following:

A. Disorganization of motor function as described in 11.04B;[3] or

B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or

---

[3] Listing 11.04B requires "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." 20 C.F.R. pt. 404, subpt., P, app. 1, § 11.04B.

> 12.02; or
>
> C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

20 C.F.R. pt. 404, subpt., P, app. 1, § 11.09.

The ALJ determined Claimant's MS did not meet Listing 11.09, explaining as follows:

> The medical evidence does not demonstrate that the claimant's multiple sclerosis meets Medical Listing 11.09 with significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements or gait and station; a visual or mental impairment meeting the criteria of Medical Listings 2.02, 2.03, 2.04 or 12.02; or significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

(R. 26). In support of his contention that his limitations meet or equal Listing 11.09, Claimant cites his diagnosis of MS dating back at least 30 years, accompanying numbness paresthesia from the waist down, decreased visual activity, insomnia, daytime sleepiness with extreme fatigue, decreased back and leg sensation from the thigh to the ankle (R. 428-29), intermittent problems with weakness, sensory loss, and gait difficulties (R. 445), memory loss (R. 354-57), and lightheadedness and dizziness (R. 69). Pl.'s Mem. [DE-18] at 14. Claimant also notes his neurologist, Dr. Jagadeesan, recommended that Claimant should not work more than 10 to 12 hours a week due to his MS. *Id.* (citing (R. 427)). The findings cited by Claimant do not demonstrate that Claimant's MS meets all of the Listing 11.09 criteria in category A, B, or C. *See Drotar*, 2015 WL 965626, at *5 ("An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify.") (citing *Sullivan*, 493 U.S. at 530). Furthermore, to the extent Claimant argues equivalence,

the ALJ's thorough discussion of the medical findings related to Claimant's MS demonstrates an absence of listing-level severity. The ALJ found that Claimant's MS had been relatively well controlled since 1997 (R. 337) and that examination first revealed decreased sensation from the thigh to ankle in November 2012, but that other findings were unremarkable (R. 430-31). (R. 28). The ALJ noted that in June 2013, Claimant reported his MS had been stable until recently, exacerbations were treated with steroids and resolved within two weeks, and Claimant's medication was changed in response to reported episodes of vertigo. (R. 28, 450-54). The ALJ concluded that, "[a]side from two brief exacerbations of multiple sclerosis, throughout the relevant period the claimant has continued to work and perform his activities of daily living, and has not sought treatment beyond conservative care for his MS which has shown to be 'relatively stable'." *Id.* The findings cited by Claimant demonstrate intermittent symptoms associated with exacerbations and do not reflect listing-level severity. Accordingly, Claimant has failed to demonstrate his MS equals Listing 11.09.

### B. The ALJ's RFC Determination

An individual's RFC is the capacity an individual possesses despite the limitations caused by physical or mental impairments. 20 C.F.R. § 404.1545(a)(1); S.S.R. 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC is based on all relevant medical and other evidence in the record, including medical source opinions. 20 C.F.R. § 404.1545(a)(3); S.S.R. 96-8p, 1996 WL 374184, at *7. Claimant contends the ALJ erred in (1) evaluating the opinion evidence, and (2) finding that Claimant has the RFC to perform a reduced range of medium exertion work and the ability to perform his past relevant work. Pl.'s Mem. [DE-18] at 15-17. Defendant contends the ALJ correctly evaluated the medical opinion evidence and the RFC determination is supported by substantial evidence in the record. Def.'s Mem. [DE-20] at 18-23.

### 1. Opinion Evidence

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). And more weight is generally given to opinions of treating sources, who usually are most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability than non-treating sources, such as consultative examiners. *Id.* § 404.1527(c)(2). Though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig*, 76 F.3d at 590. In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Id.*; *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (stating "[t]he ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence"); *Mastro*, 270 F.3d at 178 (explaining "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (citation omitted).

If the ALJ determines that a treating physician's opinion should not be considered controlling, the ALJ must then analyze and weigh all of the medical opinions in the record, taking into account the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). The ALJ is not required, however, to discuss all of these factors. *Ware v. Astrue*, No. 5:11-CV-446-D, 2012 WL 6645000, at *2 (E.D.N.C. Dec. 20, 2012) (unpublished) (citing *Oldham*

*v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Munson v. Astrue*, No. 5:08-CV-110-D(3), 2008 WL 5190490, at *3 (E.D.N.C. Dec. 8, 2008) (unpublished)). While an ALJ is under no obligation to accept any medical opinion, *see Wireman v. Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006) (unpublished), he must nevertheless explain the weight afforded such opinions. S.S.R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996); S.S.R. 96-6p, 1996 WL 374180, at *1 (July 2, 1996). An ALJ may not reject medical evidence for the wrong reason or no reason. *Wireman*, 2006 WL 2565245, at *8. "In most cases, the ALJ's failure to consider a physician's opinion (particularly a treating physician) or to discuss the weight given to that opinion will require remand." *Love-Moore v. Colvin*, No. 7:12-CV-104-D, 2013 WL 5350870, at *2 (E.D.N.C. Sept. 24, 2013) (unpublished) (citations omitted).

Claimant first argues that the ALJ erred by failing to give proper weight to the opinion of Dr. Zota (R. 347-52), who performed a consultative examination for DDS on May 29, 2012. Pl.'s Mem. [DE-18] at 18-19. Dr. Zota's examination revealed Claimant had a normal gait with no assistive device, was able to walk on heels, to squat and rise, had normal grip strength, the ability to grasp, to raise arms overhead, and to perform dexterous movements of hands, had normal range of motion in upper and lower extremities, a normal neurological exam, and a negative straight-leg raise test, but muscle spasm and a severely limited range of motion in the cervical spine and some limited range of motion in the lumbar spine. (R. 348-49). Based on his evaluation, Dr. Zota concluded Claimant's impairment "affects sitting and standing about 30-minute[s], four to five or six hour[s] per 8-hour period, walking about a half a mile. No assisting device used. Lifting about 30-pound[s]. No problem to carry, handle object[s], hear, speak or travel." (R. 349). The ALJ correctly summarized Dr. Zota's examination findings, noting that they occurred three months prior to

Claimant's cervical fusion surgery, and gave his opinion little weight. (R. 30, 32). The ALJ's discussion of Dr. Zota's findings provides ample explanation of the weight afforded his opinion. The ALJ's decision to discount Dr. Zota's opinion because it predated Claimant's successful cervical fusion surgery is not specious, but rather is well-supported by substantial evidence. *See Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (unpublished) ("An ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has failed to give a sufficient reason for the weight afforded a particular opinion, see 20 C.F.R. § 404.1527(d) (1998)."). Accordingly, the ALJ did not err in evaluating Dr. Zota's opinion.

Next, Claimant contends the ALJ erred in evaluating the opinion of Dr. Lestini (R. 433-36), Claimant's treating orthopedist who performed Claimant's cervical neck fusion on August 17, 2012. Pl.'s Mem. [DE-18] at 19-20. Dr. Lestini provided a medical source statement on April 2, 2013, in which he opined that Claimant could lift and/or carry no more than 20 pounds occasionally and 10 pounds frequently, stand and/or walk or sit about six hours in an eight-hour workday, and is limited in pushing or pulling with both upper and lower extremities due to his neck, lumbar, and thoracic areas, including significant stenosis in the lumbar spine and multiple areas of disc disease. (R. 434). The ALJ discussed Claimant's cervical fusion and Dr. Lestini's pre- and post-operative treatment notes. (R. 28-29). The ALJ noted that three months after the fusion surgery Claimant reported his preoperative symptoms had mostly resolved and that he had mild pain but was taking no pain medication and had returned to work (R. 441-44), and in February 2013, Claimant again reported his preoperative symptoms had mostly resolved, he had mild neck pain but was taking no

pain medication, and physical examination showed only mild limitation in cervical range of motion, normal gait and strength, intact sensation, and Claimant was released to normal activities as tolerated (R. 437-40). (R. 28-29). The ALJ also noted that on June 20, 2013, Claimant presented to Dr. Lestini with complaints of neck pain and right shoulder pain, but that physical examination findings were mostly normal with the exception of some mild tenderness and mild limitation on range of motion consistent with the cervical fusion, Dr. Lestini recommended conservative treatment of physical therapy, and Claimant declined a therapeutic injection. (R. 29, 462-64). The ALJ then evaluated Dr. Lestini's opinion as follows:

> I give great weight to the opinion of Treating Orthopedist Dr. William Lestini who stated on April 3, 2013 that the claimant is able to stand/walk 6 hours per day, sit 6 hours per day, and perform unlimited reaching in all directions (including overhead), with no limitations on handling, fingering and feeling (Exh. 8F). I give little to no weight to Dr. Lestini's opinion that the claimant is limited to lifting 10 lb, has limited ability push/pull in both arms and legs, and should never climb or be exposed to unprotected heights. This part of the opinion is entirely inconsistent with Dr. Lestini's treatment records, including objective findings from physical exams performed on Nov. 15, 2012 and Feb. 21, 2013 (see Exh. 8F), as well as subsequent physical exam findings from June 20, 2013 (see Exh. 12F).

(R. 31-32).

Claimant takes issue with the ALJ's failure to adopt in full Dr. Lestini's opinion, asserting that Dr. Lestini's statements are "strongly supported by the record." Pl.'s Mem. [DE-19] at 19. However, Claimant points to no specific evidence to undermine the ALJ's determination. Further, the court "must defer to the ALJ's assignments of weight unless they are not supported by substantial evidence." *Dunn*, 607 F. App'x at 271 (citing *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012)). Where a treating physician's opinion is inconsistent with and is not supported by the record evidence, the ALJ may give the opinion limited weight. *See* 20 C.F.R. § 404.1527. Here, the ALJ

sufficiently explained, citing to evidence of record, that she declined to adopt certain portions of Dr. Lestini's opinion that were inconsistent with his treatment notes. (R. 32); *see Dunn*, 607 F. App'x at 271 (concluding the ALJ did not err in affording limited weight to a treating source opinion where "there is more than a 'scintilla of evidence' in the record supporting the ALJ's conclusion" to discount the physician's opinion). Accordingly, the ALJ did not err in evaluating Dr. Lestini's opinion.

Claimant also contends the ALJ erred in evaluating the opinion of Dr. Bertics, Claimant's treating neurologist. Pl.'s Mem. [DE-18] at 20. Dr. Bertics wrote a disability letter on May 17, 2013, in which he opined, in relevant part, that "[t]he patient's multiple sclerosis interferes with his ability to be fully active, reports periods of rest but in isolation I'm not sure his deficits due to multiple sclerosis alone are severe enough to be considered totally disabling" and that "[h]e would have difficulty with maintaining a full day's activities with the MS." (R. 445). Dr. Bertics went on to suggest that "more importantly his old cervical spine disease and lumbar spine disease contributed to his inability to function in his physical job," "[h]e has significant issues with pain and ability that he reports interfere with his ability to function," and "[t]he combination of problems plus his heart history would be considered disabling for the type of non-sedentary job he has." *Id.*

The ALJ first discussed Claimant's course of treatment with Dr. Bertics. (R. 28). On June 13, 2013, Claimant saw Dr. Bertics for evaluation of MS and a vitamin D deficiency, at which time Claimant reported that "he is here for a follow up, states he is doing well, no issues at today[']s visit." (R. 450). It was noted that Claimant was first assessed by Dr. Bertics in March 2013 and that "[i]n a few months prior to transfer the patient had been having some problems with increasing imbalance and dizziness with increased numbness," "[i]t appeared like his MS might have been

breaking through," and "MRI imaging of the brain in 2012 showed stability in his MS." *Id.* Dr. Bertics recounted that at the March 2013 visit, Claimant was asked to stop his current medication and to go on a new medication, but that Claimant "was not inclined to pursue additional change in treatment." *Id.* Dr. Bertics further noted that since that time Claimant did stop his current medication and that "[h]is inclination was to take no medication at all aside from vitamin D" and he had not had "a clear additional flare." (R. 450-51). Dr. Bertics described the course of Claimant's MS as "relatively benign without the development of any extreme burden of the disease," but noted Claimant experienced two episodes of vertigo in the last three to four months on his current medication and, after further consultation, Claimant agreed to try a new medication. (R. 452). On June 20, 2013, Claimant again saw Dr. Bertics with reports of dizziness and eye pain. (R. 446). Dr. Bertics found mild bilateral optic neuropathy from MS, but noted good visual function in acuity and fields, nothing on exam to cause dizziness, and reassured Claimant that experiencing eye soreness with rubbing was nothing to worry about. (R. 448). The ALJ then evaluated Dr. Bertics' opinion as follows:

> I give great weight to the opinion from Treating Neurologist Dr. Gregory Bertics offered on May 17, 2013 that "in isolation I'm not sure his deficits due to multiple sclerosis alone are severe enough to be fully disabling" (Exh. 9F). However, I give very little weight to the remainder of opinions offered on this date, including that the claimant's "MS interferes with his ability to be fully active" and that "he would have difficulty with maintaining a full day's activities with the MS." These appear to be based in large part, if not entirely, on the claimant's subjective report of symptoms. They are internally inconsistent with the earlier opinion offered, and are not consistent with diagnostic imaging showing stable MS with no active lesions, or other neurology treatment records (such as from June 13, 2013 where the claimant "states he is doing well with no issues" and the Neurologist observes the claimant was presently working "a physically active job that requires carrying, lifting, crouching, pulling and pushing", Exh. 10F).
>
> Moreover, very little weight is offered to Dr. Bertics' opinion that – after only two

> months of treating the claimant – he thought "**more importantly**, his old cervical spine disease and lumbar spine disease contributed to his inability to function in his physical job" and "the combination of problems would be considered disabling for the type of non-sedentary job he has" (Exh. 9F). This is not supported by neurology treatment records at Exh. 7F and 10F, nor Orthopedic treatment records at Exh. 10F. Furthermore, this Neurologist admits that he treats the claimant for multiple sclerosis – not for lumbar or cervical spine problems, which is what Dr. Bertics believes would "more importantly" contribute to the claimant's "inability to function in his physical job". Dr. Bertics is not an orthopedist, and his opinions on orthopedic impairments are not persuasive in light of other evidence from treating sources who are experts in this field (see e.g., treatment records from Orthopedists at Exh. 8F and 12F).

(R. 33).

Claimant takes issue with the ALJ's failure to adopt in full Dr. Bertics' opinion, asserting that Dr. Bertics' statements are "strongly supported by the record." Pl.'s Mem. [DE-19] at 20. However, as with Dr. Lestini's opinion, Claimant's argument in this regard is conclusory and no specific evidence is cited to undermine the ALJ's determination. The ALJ appropriately considered several factors, including treatment relationship, supportability, consistency, and specialization, in accordance with 20 C.F.R. § 404.1527 and cited substantial evidence in the record to support the weight afforded. (R. 32). Accordingly, the ALJ did not err in evaluating Dr. Bertics' opinion.

Finally, Claimant contends the ALJ erred in evaluating the opinion of Dr. Jones, Claimant's treating orthopedist who performed Claimant's left hip arthroscopy on September 4, 2013. Pl.'s Mem. [DE-18] at 21. Dr. Jones completed a medical source statement on August 26, 2013, in which he opined that Claimant could only lift and/or carry 10 pounds, stand and/or walk for less than two hours in an eight-hour workday (for recovery), must alternate sitting and standing every two hours, is limited in pushing and/or pulling in his lower extremities and no bending, squatting, or using his hip, and never climb, kneel, crawl, or stoop with only occasional balancing. (R. 459-61). Dr. Jones noted that Claimant was scheduled for hip arthroscopy on September 4, 2013 and would be limited

in walking and standing with no heavy lifting during the recovery period. (R. 460). The ALJ gave Dr. Jones' opinion little weight because (1) it was prospective and not based on Claimant's condition after the hip arthroscopy, (2) it contained no temporal limitation on the recovery period, and (3) treatment notes reflected no post-operative complications, an improvement in Claimant's symptoms in his left hip, and Claimant was 100% weight bearing with no pain medication and reported feeling great five weeks after his procedure. (R. 32). As with the opinions of Drs. Lestini and Bertics, Claimant asserts in a conclusory fashion that the ALJ should have afforded controlling weight to Dr. Jones' opinion without citing any specific evidence to undermine the ALJ's determination. Pl.'s Mem. [DE-18] at 21. The ALJ appropriately considered that Dr. Jones' opinion was limited to the recovery period for Claimant's hip arthroscopy, which the treatment notes reflect was successful in treating his symptoms. (R. 466-67, 576-77). Accordingly, the ALJ did not err in evaluating Dr. Jones' opinion.

**2. Ability to Perform Medium Exertion Work and Past Relevant Work**

Claimant contends the ALJ erred in determining that Claimant can perform medium exertion work and, resultantly, that Claimant can also perform his past relevant work. Pl.'s Mem. [DE-18] at 15-17. In support thereof, Claimant relies on the opinions of Drs. Jones, Zota, and Bertics, Claimant's own testimony, and the opinion of Dr. Jagadeesan, Claimant's former treating neurologist. *Id.* Claimant also contends the ALJ improperly relied on the fact that Claimant has been able to work over the years despite his MS. *Id.*

As discussed above, the ALJ appropriately discounted the opinions of Drs. Jones, Zota, and Bertics and, accordingly, their opinions do not undermine the ALJ's RFC determination. With respect to the opinion of Dr. Jagadeesan—that Claimant can only work 10 to 12 hours weekly due

to his MS—, the ALJ gave this opinion no weight, finding it completely without support (R. 32, 427), and Claimant did not challenge the weight afforded to Dr. Jagadeesan's opinion. Therefore, Dr. Jagadeesan's opinion does not undermine the ALJ's RFC determination.

With respect to Claimant's testimony that he is only able to stand 30 minutes before having to sit down and sit for 30 minutes before he has to shift position due to pain (R. 75-76), has constant back pain (R. 73), and that his doctors indicated he should not be working (R. 77), the ALJ found Claimant's testimony not fully credible (R. 28). It is within the province of the ALJ to determine a claimant's credibility, *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984), and Claimant does not challenge the ALJ's credibility determination. Furthermore, the ALJ's opinion demonstrates she appropriately considered all the evidence of record, including Claimant's testimony, activities of daily living, and the medical evidence, including opinion evidence, in assessing Claimant's credibility. (R. 27-34); *see* S.S.R. 96-7p, 1996 WL 374186, at *2 (July 2, 1996) (the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."); *Taylor v. Astrue*, No. 5:10-CV-263-FL, 2011 WL 1599679, at *4-8 (E.D.N.C. Mar. 23, 2011) (unpublished) (finding the ALJ properly considered the entire case record to determine that claimant's subjective complaints of pain were not entirely credible), *adopted by* 2011 WL 1599667 (E.D.N.C. Apr. 26, 2011). Accordingly, Claimant's testimony does not undermine the ALJ's RFC determination.

Finally, Claimant argues it was improper for the ALJ to consider Claimant's work history despite his MS due to the progressive nature of the impairment. Pl.'s Mem. [DE-18] at 17. The ALJ noted that Claimant testified he stopped working in 2013 by choice (R. 27, 48), and the ALJ cited treatment notes indicating Claimant's MS was relatively stable with only brief flares and required

only conservative treatment (R. 28, 31, 446-48, 450-52). *See Gross*, 785 F.2d at 1166 (holding that the diagnosis of a condition, alone, is insufficient to prove disability, because there must also be "a showing of related functional loss"); *Richardson v. Colvin*, No. 4:14-CV-00125-FL, 2015 WL 5725546, at *6 (E.D.N.C. Aug. 11, 2015) (unpublished) (finding conservative treatment lends little support to claims of debilitating symptoms), *adopted by* 2015 WL 5737613 (E.D.N.C. Sept. 30, 2015). Claimant cites no authority for the assertion that it was improper for the ALJ to consider Claimant's ability to perform his past work despite having MS. And, the ALJ did not rely solely on Claimant's work history in determining that he could perform his past relevant, medium exertion work, but rather thoroughly discussed Claimant's testimony regarding his limitations, his treatment history, including the objective medical tests, and the opinion evidence, as required by the regulations. (R. 27-34); 20 C.F.R. § 404.1545(a)(3). It is not within the province of the court to reweigh the evidence, even if the court might reach a different result, where the ALJ has considered and analyzed all the relevant evidence and the decision is supported by substantial evidence, as is the case here. *Mastro*, 270 F.3d at 176 (citing *Craig*, 76 F.3d at 589). Accordingly, this assertion of error is without merit.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-17] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-19] be ALLOWED, and the final decision of the Commissioner be UPHELD.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **June 22, 2016** to file written objections to the Memorandum and Recommendation. The presiding district judge must

conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C. Any response to objections shall be filed within **14 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).**

Submitted, this the 9th day of June 2016.

Robert B. Jones, Jr.
United States Magistrate Judge